**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CARL ORTON, JR.,**

                                        **Plaintiff,**


                    **v.**                              **7:11-CV-630**
                                                         **(FJS/ATB)**


**MICHAEL J. ASTRUE,**

                                    **Defendant.**
_____


**APPEARANCES**                          **OF COUNSEL**

**CONBOY, MCKAY, BACHMANN**              **PETER L. WALTON, ESQ.**
**& KENDALL, LLP**
407 Sherman Street
Watertown, New York 13601
Attorneys for Plaintiff

**SOCAL SECURITY ADMINSITRATION**        **MONIKA K. PROCTOR, ESQ.**
**OFFICE OF SGENERAL COUNSEL**           **SUZANNE M. HAYNES, ESQ.**
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant


**SCULLIN, Senior Judge**


**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    Plaintiff Carl E. Orton, Jr. brings this action pursuant to the Social Security Act (the

"Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner") denying him Supplemental Security Income benefits ("SSI").

Currently before the Court are Plaintiff's and Defendant's cross-motions for judgment on the pleadings or, in the alternative, for summary judgment.

## II. BACKGROUND

### A.   Procedural history

On January 7, 2009, Plaintiff filed for SSI benefits, citing a learning disability, attention deficit hyperactivity disorder ("ADHD") and post-traumatic stress disorder ("PTSD") as his disabling conditions.  *See* Administrative Record ("AR") at 54-55, 102, 172.  Plaintiff alleges a disability onset date of June 30, 2008.  *See id.*  The Social Security Administration ("SSA") denied his application on April 23, 2009, *see id.* at 69; and Plaintiff filed a timely request for a hearing before an administrative law judge ("ALJ") on May 12, 2009, *see id.* at 73.

On May 26, 2010, Plaintiff appeared before ALJ Koennecke for his initially scheduled hearing.  Plaintiff requested and ALJ Koennecke granted him an adjournment to obtain legal counsel.  *See id.* at 24-35.  On August 19, 2010, ALJ Koennecke presided over that hearing via video in Watertown, New York.  *See id.* at 12, 94.  Plaintiff appeared with his attorney, Peter L. Walton, Esq., and testified.  *See id.* at 12, 35, 38-65.  In a decision dated September 20, 2010, ALJ Koennecke denied Plaintiff's application for SSI benefits.  *See id.* at 9, 12-23.  ALJ Koennecke stated that she considered the entire record and made the following findings:

    (1)    Plaintiff had not engaged in substantial gainful activity since December 10, 2008, the date he applied for SSI.

(2)     Plaintiff had suffered from the "severe" impairment of "mental retardation,"[1] as that term is used in the relevant SSA regulations.

(3)     Plaintiff did not have an impairment or combination thereof that met or medically equaled any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

(4)     Plaintiff had the residual functional capacity ("RFC") to perform the full range of work at all exertional levels.

(5)     Plaintiff had no past relevant work.

(6)     Plaintiff was born on July 4, 1985, and was twenty-three years old on the date he filed his SSI application, which is defined as a younger individual aged eighteen to forty-nine.

(7)     Plaintiff had at least a high school education and communicated in English.

(8)     Transferability of job skills was not an issue because Plaintiff did not have past relevant work.

(9)     Considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that exist in significant numbers in the national economy.

(10)    Plaintiff had not been under a disability as defined by the Act, from June 30, 2008, the alleged onset date, through September 20, 2010, the date of the ALJ's decision.

*See id.* at 14-22.

On November 5, 2010, Plaintiff filed a timely request for review of ALJ Koennecke's decision. *See id.* at 7. By Order dated April 11, 2011, the SSA Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the Commissioner's final decision. *See id.* at 1-4.

---

[1] The SSA is transitioning to replace the term "mental retardation" with "intellectual disability" because "mental retardation" is offensive to many individuals. *See Proposed Rules: Revised Medical Criteria for Evaluating Mental Disorders*, 75 Fed. Reg. 51336-01, 51339 (proposed Aug. 10, 2010) ("We refer to 'intellectual disability' and 'mental retardation' together as the same disorder." (footnote omitted)). The Court, therefore, will use these terms interchangeably. *See Talavera v. Astrue*, 697 F.3d 145, 148 (2d Cir. 2012).

On June 7, 2011, Plaintiff commenced this action, taking issue with almost all of the ALJ's findings and arguing generally that they lacked support from the record and were contrary to the applicable legal standards. *See* Dkt. No. 1. He filed a supporting brief on October 27, 2011. *See* Dkt. No. 15. Defendant thereafter filed an answer on September 26, 2011, *see* Dkt. No. 7, and a brief in opposition on December 12, 2011, *see* Dkt. No. 12.

**B.     Plaintiff's medical history and hearing testimony**

   *1.   Relevant medical history*

      *a.   Mercy of Northern New York Behavioral Health*

On February 17, 2006, Plaintiff sought mental health treatment at Mercy of Northern New York Behavioral Health ("Mercy BH"). *See* AR at 255. On March 9, 2006, Plaintiff saw Dr. Lise A. Hall, Psy.D. *See id.* at 251-53. Plaintiff told Dr. Hall that his parents physically and verbally abused him until the age of eighteen (*e.g.*, Plaintiff's parents allegedly fed him alcohol every day since infancy). *See id.* at 251. Plaintiff also reported experiencing nightmares related to the abuse approximately one to two times per week. *See id.* at 251, 253. He admitted to using cannabis until 2003 and alcohol until 2005. *See id.* at 251.

According to Dr. Hall's mental status evaluation, Plaintiff's speech, appetite, appearance, and hygiene were normal and his mood was euthymic. *See id.* at 251-52. He was also oriented in time, day, person, and place, denied suicidal and homicidal ideations, and experienced no hallucinations. *See id.* at 252. Conversely, Plaintiff's judgment, insight, and impulse were poor, his motor activity was restless, his attention and memory were distracted, and he demonstrated "magical thinking." *See id.* at 251-52. Dr. Hall, therefore, diagnosed Plaintiff with PTSD, partner relational problem, borderline intellectual functioning (provisional), headaches, cognitive

4

limitations, marital and financial stress, and a Global Assessment of Function ("GAF") score of 55.[2]  *See id.* at 253.  In doing so, Dr. Hall noted that Plaintiff did not endorse the full criteria for major depression, bipolar disorder, or any specific anxiety disorder beyond PTSD.  *See id.*

On April 3, 2006, Dr. Michael Camillo, a psychiatrist at Mercy BH, prescribed Plaintiff medication and one-on-one counseling with a clinical therapist.  *See id.* at 254, 256.  During the next month, however, Plaintiff attended only two of five individual therapy appointments and one of two medication appointments; and he did not attempt to contact Mercy BH to reschedule those appointments.  *See id.* at 255.  Due to Plaintiff's repeated and unexplained absences, Mercy BH discharged Plaintiff from treatment on May 8, 2006.  *See id.*

### b.  Consultative evaluations

#### i.  Dr. William Kimball, Ph.D.

On March 28, 2009, Dr. Kimball, a consultative psychologist, performed an evaluation of Plaintiff that included an interview, mental status examination, and administration of a Wechsler Adult Intelligence Scale Fourth Edition ("WAIS-IV") and Wide Range Achievement Test-IV ("WRAT-IV").  *See id.* at 223-29.  During the interview, Plaintiff reported a history of mental health treatment as a child, including Ritalin for ADHD.  *See id.* at 225.  He stated that he stopped taking Ritalin when he was approximately ten years old because it was "making things worse."  *See id.*  Other than possibly attending school counseling as a child, Plaintiff stated that he had never received psychiatric treatment or been hospitalized for psychiatric reasons as an

---

[2] GAF is a scale ranging from zero to 100 that indicates a clinician's overall opinion of an individual's psychological, social, and occupational functioning.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376-77 (4th ed., text revision, 2000) ("DSM-IV-TR").  A GAF score ranging from 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

adult.  *See id.*  In addition, Plaintiff told Dr. Kimball that, in high school, he attended special education classes, had some friends, and did not have behavioral issues.  *See id.* at 224.  At home, Plaintiff claimed he helped with washing dishes, cleaning, carrying groceries, and other simple chores.  *See id.* at 228.  In terms of hobbies and interests, Plaintiff stated that he "love[d] working on cars."  *See id.* at 224.  He further maintained that he was close to his grandparents, an aunt, and an uncle; and he had one local friend whom he saw often.  *See id.* at 224-25.  Regarding past employment, Plaintiff told Dr. Kimball that he had stocked shelves for three months but had had difficulty with the job and had "got[ten] the numbers backwards."  *See id.* at 225.  Likewise, he reported that he had worked at McDonalds but he had had trouble learning new tasks and had performed too slowly.  *See id.*

On the mental status examination, Dr. Kimball observed that Plaintiff was well-groomed and established rapport easily.  *See id.*  His speech was easy to understand despite a limited vocabulary.  *See id.*  Dr. Kimball also observed no signs of delusions, hallucinations, obsessions, or preoccupations.  *See id.*  Plaintiff's affect was positive and appropriate, and he showed a reasonable sense of humor.  *See id.* at 226.  He remarked that he enjoyed working on cars and spending time with his girlfriend, their son, and his friend.  *See id.*  Plaintiff denied feeling depressed or nervous and commented that his sleeping and eating habits were normal.  *See id.*  Further, Dr. Kimball noted that Plaintiff was well-oriented irrespective of his "a low fund of knowledge" (*e.g.*, he allegedly did not know the name of the president of the United States).  *See id.*  He could remember three out of three objects on an immediate and delayed basis but he performed poorly in serial sevens due to arithmetic problems.  *See id.*  Plaintiff's insight and judgment were also fair.  *See id.*

6

Furthermore, Dr. Kimball noted that Plaintiff tried hard during the WAIS-IV intelligence test and demonstrated adequate concentration, focus, and persistence.  *See id.*  Plaintiff's scores for verbal comprehension, perceptual reasoning, working memory core, and processing speed placed him in the tenth percentile, at best.  *See id.*  Plaintiff's full-scale IQ score of 66 fell between the mentally retarded and borderline range of intelligence.  *See id.*  Dr. Kimball noted that Plaintiff had difficulty working at an adequate rate of speed and had poor arithmetic skills. *See id.* at 227.  Similarly, the WRAT-IV indicated academic problems consistent with Plaintiff's poor perceptional skills.  *See id.* at 227-28.

Based on the foregoing, Dr. Kimball opined that Plaintiff "would not be able to read anything meaningful" and had learning problems that "would prevent him from doing jobs other than really concrete jobs that involve[d] no academic skills."  *See id.* at 228-29.  He diagnosed Plaintiff with a reading disorder, a math disorder, borderline intelligence, and assessed a GAF score of 55.  *See id.* at 228.  In addition, Dr. Kimball remarked that the differentiation between borderline intelligence and mental retardation was difficult to gauge; however, Plaintiff's verbal comprehension skills suggested that he had borderline intelligence with significant learning problems.  *See id.* at 229.  He further noted that Plaintiff might need some vocational assistance such as a job coach.  *See id.* at 228-29.


### ii.   Dr. P. Kudler

On April 20, 2009, Dr. P. Kudler, a psychologist and State agency medical consultant, completed a Psychiatric Review Technique Form ("PRTF") and a mental residual functional capacity assessment ("Mental RFC") for Plaintiff.  *See id.* at 230-46.  In the PRTF, Dr. Kudler assessed that Plaintiff suffered perceptual or thinking disturbances and memory impairment.  *See*

*id.* at 231.  Dr. Kudler also opined that Plaintiff had mild restriction in his activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  *See id.* at 240.

In the Mental RFC, Dr. Kudler assessed that Plaintiff had moderate limitations in his ability to (1) understand, remember, and carry out detailed instructions; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (3) respond appropriately to changes in the workplace.  *See id.* at 244-45.  Dr. Kudler assessed no significant limitations in the other areas of mental functioning.  *See id.*  Dr. Kudler further opined that Plaintiff could carry out simple work.  *See id.* at 246.


### c.   *Carthage Area Behavioral Health Center*

On November 19, 2010, two months after the ALJ's decision, Plaintiff visited the Carthage Area Behavioral Health Center ("Carthage BH") for mental health treatment.  *See* AR at 258-64.  Kristen Bloom, a licensed mental health counselor, conducted the initial assessment.  *See id.* at 258-59.  In addition to the medical history that Plaintiff had told previous medical professionals, Plaintiff reported difficulty sleeping and olfactory hallucinations of smoke.  *See id.* at 263-64.  He told Ms. Bloom that he was looking for work and spent his days performing household chores and caring for his two children, ages two years and three months.  *See id.* at 261.

On the mental status examination, Ms. Bloom observed Plaintiff's appearance as disheveled, his speech as impoverished, his remote memory as disrupted, and his judgment and insight as fair.  *See id.* at 263.  At the same time, Ms. Bloom noted, among other things, that

Plaintiff's motor activity was relaxed, his mood was euthymic, his affect broad, his expressive language normal, his attention and concentration good, his thought processes lucid, and his recent memory intact.  *See id.* at 263-64.  He was also cooperative, oriented in all spheres, and showed no suicidal or homicidal ideations.  *See id.* at 263-65.

Based on the foregoing, Ms. Bloom opined that Plaintiff had a below average IQ.  *See id.* at 263.  She further assessed that Plaintiff's prognosis was "good," meaning that he was "likely to respond to treatment within 3 months; ha[d] social/economic support, acceptance of disease; process; mild to moderate disorder."  *See id.* at 264.

On December 20, 2010, Plaintiff returned to Carthage BH with symptoms of hyper vigilance and fear of loud noises.  *See id.* at 269.  He described, among other things, feeling helpless, crying a lot, and sleeplessness.  *See id.*  His diagnosis remained PTSD but his GAF score dropped to 42, indicating serious symptoms or a serious impairment in social, occupational, or school functioning.  *See id.*

### 2. *Relevant hearing testimony*

On August 19, 2010, Plaintiff testified at the rescheduled hearing about the nature and extent of his conditions and limitations.  *See* AR at 39.  Plaintiff reported that in 2006 he had attended Mercy BH for therapy to control his ADHD without medicine.  *See id.* at 52.  Although the treatment worked sometimes, Plaintiff testified that he stopped attending his scheduled appointments because his Medicaid ran out and he could not pay for it.  *See id.* at 52-53.  Plaintiff also stated that he had difficulties with the people at Mercy BH because he resisted their suggested pharmacology treatment.  *See id.* at 53.

With regard to Plaintiff's PTSD, he testified that he suffered flashbacks due to his traumatic childhood. *See id.* at 53. He said the flashbacks lasted approximately fifteen seconds to two minutes and occurred anywhere from four times per day to one time per week. *See id.* at 54-56. Because of the PTSD, Plaintiff contended that his concentration and sleep were negatively affected. *See id.* at 54, 56. In addition, Plaintiff averred that, when "his mind bec[ame] too relaxed" or when someone yelled at him, he froze up and cried for fifteen minutes to an hour. *See id.* at 54. Particularly, Plaintiff testified that McDonalds terminated his four-month employment on June 30, 2008, after he responded to his boss yelling at him by sitting down and crying while his coworkers mocked him. *See id.* at 56. Plaintiff continued that, although he was not receiving treatment for PTSD, his symptoms had been continuous since June 30, 2008. *See id.* at 55.

Next, Plaintiff testified that he struggled to read and to write anything beyond his name and simple notes. *See id.* at 40-41. For instance, he testified that his fiancé read all the letters that SSA and his attorney sent him and completed job applications and other forms on his behalf. *See id.* Plaintiff also noted challenges with cooking and grocery shopping because he could neither measure food nor read recipes and food labels. *See id.* at 57-58. Further, he stated that it had been difficult to find a job that did not require any reading. *See id.* at 50.

Moreover, Plaintiff testified that he had difficulty concentrating on multiple things at one time because he got distracted easily. *See id.* at 61-62. Nonetheless, Plaintiff stated that he liked woodworking and repairing cars (*e.g.*, changing the oil and working on transmissions, tires, and brakes). *See id.* at 63-64. He explained that he was unable to read an instruction manual on repairing cars and did not know the names of all the parts. *See id.* at 63.

Regarding his employment history, Plaintiff had worked for six months cleaning offices and one month as a laborer at a can redemption center.  *See id.* at 173.  Additionally, Plaintiff testified that he had encountered various hurdles in his previous jobs, including working too slowly, making too many mistakes, difficulties reading, and problems interacting with his coworkers properly.  *See id.* at 43-47.  He also testified that employers had rejected his applications based on his illiteracy and ADHD symptoms.  *See id.* at 48-49.

## III. DISCUSSION

### A.      Scope of review

When reviewing the Commissioner's final decision, the district court may set aside a non-disability determination "only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  The court's factual review of the Commissioner's decision is limited to whether substantial evidence in the record supports the decision.  *See* 42 U.S.C. § 405(g); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quotation omitted).  The Supreme Court has defined substantial evidence to mean "more than a mere scintilla" and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  Additionally, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *See Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex. rel. of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  A court, however, "cannot substitute its interpretation of the administrative record for that of the [ALJ] if the record contains substantial support for the ALJ's decision.  If the [ALJ's] finding is supported by substantial evidence, it is conclusive."  *Scott v. Comm'r of Soc. Sec.*, No. 06-CV-481, 2009 WL 1559819, *2 (N.D.N.Y. June 2, 2009) (citations omitted); *see also* 42 U.S.C. § 405(g).

In addition, the district court may not affirm an ALJ's disability determination if it reasonably doubts whether the ALJ applied the proper legal standards, even if it appears that substantial evidence supports that determination.  *See Pollard v. Halter,* 377 F.3d 183, 188-89 (2d Cir. 2004) (quotation omitted); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987) (citations omitted).  "'Failure to apply the correct legal standards is grounds for reversal.'"  *Pollard,* 377 F.3d at 189 (quotation omitted).

**B.      Five-step determination of disability**

To qualify for SSI, a claimant must show that he suffers from a disability within the meaning of the Act.  *See* 42 U.S.C. § 423(a), (d).  The Act defines "disability" as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, a claimant's

> [p]hysical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists

in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. § 1382c(a)(3)(B).

In evaluating SSI claims, an ALJ follows a five-step sequential evaluation process:

First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [ALJ] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [ALJ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  The claimant bears the burden of proof on the first four steps.  *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  If the claimant satisfies his burden, the burden shifts to the Commissioner at step five to "'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Id.* (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)) (other citation omitted).

C.      **Step two: severity of Plaintiff's alleged PTSD**

At step-two of the sequential analysis, the claimant bears the burden of proving that he suffers from a medically determinable mental or physical impairment that (1) satisfies the duration requirement and (2) significantly limits his ability to perform basic work activities.  *See* 20 C.F.R. §§ 416.909, 416.920(c).

13

### 1. *Duration requirement*

The duration requirement demands that a claimant's impairment last, or be expected to last, for a continuous period of at least twelve months.  *See* 20 C.F.R. § 416.909.  The onset date, not the date of diagnosis, is the critical date for measuring whether a claimant's impairment satisfies the duration requirement.  *See Gray v. Astrue*, No. 04 Civ. 3736, 2007 U.S. Dist. LEXIS 73435, *12 (S.D.N.Y. Oct. 3, 2007) (quotation and other citation omitted).

In this case, the ALJ properly concluded that Plaintiff's PTSD was a non-severe impairment because Plaintiff failed to show that it had lasted or was expected to last for a continuous period of twelve months (hereinafter "duration requirement").[3]  *See* AR at 15.  As previously stated, Dr. Hall at Mercy BH diagnosed Plaintiff with PTSD on March 9, 2006; however, this diagnosis alone was insufficient to satisfy the duration requirement because it was rendered more than two years before Plaintiff's alleged onset date of June 30, 2008.  *See id.* at 251-53; *see also Cook v. Astrue*, No. 08-CV-1351, 2011 U.S. Dist. LEXIS 66395, *12 (N.D.N.Y. May 24, 2011) (affirming the ALJ's finding that the claimant's PTSD was a non-severe impairment, in part, because "[t]he PTSD diagnosis was made more than five years before the alleged onset date"), *adopted by* 2011 U.S. Dist. LEXIS 66353 (N.D.N.Y. June 22, 2011).

Additionally, the record lacks evidence that Plaintiff's PTSD symptoms ran continuously for at least twelve months.  *See* AR at 223-70; *see also Brown v. Astrue*, No. 5:11-CV-00852, 2013 U.S. Dist. LEXIS 1515, *18 (N.D.N.Y. Jan. 4, 2013) (holding that the claimant's depression did not satisfy the duration requirement because he allegedly suffered from an

---

[3] The ALJ further determined that Plaintiff's ADHD was a non-severe impairment under the regulations; conversely, he found that Plaintiff's intellectual disability was a severe impairment given his low-level intelligence, which limited him to unskilled work.  *See* AR at 15-16.  Plaintiff does not object to either of these findings; and, thus, the Court has not addressed them.

impairment between December 2008 and January 2009, yet he was incarcerated in February 2009, and offered no evidence of continuing treatment).  Mercy BH discharged Plaintiff from treatment on May 8, 2006, because of his repeated and unexplained "no-shows" to appointments; and the record lacks evidence that he sought treatment thereafter.  *See* AR at 15, 255-56.  In fact, Plaintiff neither attempted to reschedule these appointments nor responded to Mercy BH's efforts to reschedule.  *See id.*

Thereafter, Dr. Kimball examined Plaintiff on March 28, 2009, and did not reference a continuing PTSD diagnosis in his report.  *See id.* at 228.  Rather, Dr. Kimball only diagnosed Plaintiff with a reading disorder, math disorder and borderline intelligence.  *See id.*  Dr. Kimball found no meaningful indication of PTSD symptoms, as he observed that Plaintiff (1) had no signs of delusions, hallucinations, obsessions or preoccupations; (2) had a positive and appropriate affect; (3) was well oriented and not anxious; (4) could concentrate, focus, and persist well; and (5) "had no sign of current psychiatric issues."  *See id.* at 225-26, 228.  Although medical professionals at Carthage BH diagnosed Plaintiff with PTSD, their records only address his impairment in November 2010 and December 2010.  *See id.* at 266-67.  Finally, the ALJ properly found that Plaintiff's alleged flashbacks, which he insisted he experienced periodically and affected his ability to concentrate and sleep, were also deficient in satisfying the duration requirement.  *See id.* at 15.

Based on the foregoing medical evidence, or lack thereof, the Court finds that Plaintiff falls short of satisfying the duration requirement with respect to his PTSD.

## 2. Severity

In addition to addressing the duration requirement, an ALJ must determine whether the claimant has a severe impairment that significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.921(a). Basic work activities refer to "the abilities and aptitudes necessary to do most jobs," including, "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b)(3)-(6).

"The claimant bears the burden of presenting evidence establishing severity." *Flagg v. Astrue*, No. 5:11-CV-00458, 2012 U.S. Dist. LEXIS 126708, *18 (N.D.N.Y. Sept. 6, 2012) (citations omitted)). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Id.* at *18-*19 (quotation omitted). In fact, "a 'finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" *Id.* (quoting *Bowen*, 482 U.S. at 154 n.12) (other citations omitted).

In this case, Plaintiff has failed to present meaningful evidence that his PTSD had "more than a minimal" impact on his ability to work. Plaintiff offers nothing more than two diagnoses to prove the severity of his PTSD. *See Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (stating that "[t]he presence of an impairment is thus not in and of itself a disability within the meaning of the Act" (citations omitted)). Importantly, not only does the medical evidence in the record sparsely document Plaintiff's PTSD, but it also does not indicate functional limitations, if any, that this condition imposes. *See Pollard v. Astrue*, No. 07-CV-440, 2009 U.S. Dist. LEXIS

60619, *11 (N.D.N.Y. May 27, 2009) (finding no indication that the claimant's asthma and bronchitis were severe where her medical records reflected that she periodically suffered those conditions (footnote omitted)), *adopted by* 2009 U.S. Dist. LEXIS 60240 (N.D.N.Y. July 14, 2009).  Contrary to Plaintiff's contention, the ALJ did not overlook significant medical evidence. Finally, Plaintiff's self-serving testimony regarding his flashbacks, without more concrete medical evidence, is unpersuasive to find that his PTSD is a severe impairment under the regulations.  *See* 20 C.F.R. § 416.908 (stating that a "mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms . . .").

Accordingly, the Court finds that the ALJ properly concluded that Plaintiff's PTSD was a non-severe impairment and that substantial evidence supports her finding.


**D.     Step three: listing level severity**

At step-three of the sequential analysis, the claimant bears the burden of proving that his impairment or combination thereof meets or medically equals an impairment presented in the Listings.  *See Kaminski v. Astrue*, No. 09-CV-655, 2012 U.S. Dist. LEXIS 35134, *9-*10 (N.D.N.Y. Feb. 21, 2012) (citations omitted); *cf.* 20 C.F.R. § 416.925(a) (explaining that the Listing "describes for each of the major body systems impairments that [the ALJ] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience").  If the claimant meets this burden, then he is "'conclusively presumed to be disabled and entitled to benefits.'"  *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995) (quotation omitted).  To satisfy his burden, the claimant must show that he has a medically determinable impairment that satisfies all of the specified criteria in a

specific Listing.  *See* 20 C.F.R. § 416.925(d).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citation and footnotes omitted); *see also* 20 C.F.R. § 416.925(d).

Listing § 12.05 addresses mental retardation; and claimants are *per se* disabled if the requirements of paragraphs A, B, C, or D for § 12.05 are met.  *See* 20 C.F.R Pt. 404, Subpt. P, App. 1 § 12.05 (referring to mental retardation as "significantly subaverage general intellectual functioning deficits in adaptive functioning initially manifested . . . before age 22").  At issue in this case is paragraph § 12.05(C).[4]  To satisfy this paragraph, a claimant must demonstrate (1) a valid, verbal, performance, or full scale IQ of 60 through 70; (2) deficits of adaptive functioning manifesting before age twenty-two; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.  *See id.*

Here, because Plaintiff earned a valid full-scale IQ score of 66 on March 28, 2009, only the second and third requirements of Listing § 12.05(C) are at issue.  *See* AR at 18-19, 226.

### 1.  *Deficits in adaptive functioning*

"Deficits in adaptive functioning 'denote[] an inability to cope with the challenges of ordinary everyday life.'"  *Edwards v. Astrue*, No. 5:07-CV-898, 2010 U.S. Dist. LEXIS 96830, *7 (N.D.N.Y. Sept. 16, 2010) (quotation omitted).  "'Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills.'"  *Id.* (quotation omitted).  "Courts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22: evidence a claimant attended

---

[4] The ALJ also found that Plaintiff's condition failed to satisfy the requirements of paragraphs A, B, and C of § 12.05.  Since Plaintiff objects only to the ALJ's finding with respect to paragraph C, the Court will only address that finding.

special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math." *MacMillan v. Astrue*, No. 07-CV-0959, 2009 U.S. Dist. LEXIS 125597, *17 (N.D.N.Y. Nov. 17, 2009) (citations omitted).  A claimant, however, does not suffer from adaptive deficits where he "can dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs[.]" *Edwards*, 2010 U.S. Dist. LEXIS 96830, at *8 (citation omitted).

The record in this case indicates that Plaintiff attended special education high school classes, had profound difficulties with reading, writing, spelling, and arithmetic, suffered borderline intelligence, and lived with his fiancé, their two young children, his fiancé's mother and brother at the time of the hearing.  *See* AR at 39.  Notwithstanding, substantial evidence supports the ALJ's conclusion that Plaintiff lacked the necessary deficits in adaptive functioning. *See Weather v. Astrue*, No. 6:11-CV-00890, 2012 U.S. Dist. LEXIS 181956, *5 (N.D.N.Y. Dec. 27, 2012) (stating that, "[i]f supported by substantial evidence, the [ALJ's] finding must be sustained 'even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [ALJ's]'" (quotation omitted)).  An overview of the supporting evidence follows.

At the hearing, Plaintiff testified that he meaningfully participated in caring for his two children, who were ages two and eight at that time.  *See* AR at 18, 64.  For instance, he claimed that he fed and changed them and took them to places like the park.  *See e.g.*, *Talavera*, 697 F.3d at 153 (finding, in part, that the claimant did not have deficits in adaptive functioning where she "meaningfully participate[d] in the care of her two young children"); *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (concluding that the claimant did not have deficits in adaptive

functioning where she, among other things, took care of three children without help and without having them removed from her custody).

Additionally, Plaintiff testified at the hearing, as well as reported to Dr. Kimball, that he (1) performed household chores, such as cleaning, washing dishes, and doing laundry; (2) cooked Roman noodles and hot dogs; (3) enjoyed repairing automobiles (*i.e.*, changing the oil, transmission, tires, and brakes); and (4) dressed, bathed, shaved, and used the toilet independently. *See* AR at 16, 18, 20-21, 56-58, 224, 228. Plaintiff also told Dr. Kimball that he "love[d] time with his son" and "enjoy[ed] time with his girlfriend." *See id.* at 224. Further, Dr. Kimball observed that Plaintiff did not seem anxious, controlled his temper, and showed no sign of any current psychiatric issues. *See id.*

Accordingly, the Court finds that the ALJ properly concluded that Plaintiff lacked the requisite deficits in adaptive functioning to establish that his intellectual disability satisfies § 12.05(C) and denies Plaintiff's motion on this ground.

### 2. *Other severe medical impairment*

"The Second Circuit 'has not yet ruled on what test should be utilized in determining whether a claimant's "physical or other mental impairment," other than his low IQ imposes a significant work-related limitation.'" *Kaminski*, 2012 U.S. Dist. LEXIS 35134, at *12 (quotation omitted). Nevertheless, this Court has applied the test used at step two of the sequential analysis to determine whether the claimant suffers from an additional severe mental impairment. *See id.* (citations omitted); *MacMillan*, 2009 U.S. Dist. LEXIS 125597, at *21 (citations omitted).

In the instant case, the ALJ properly concluded that Plaintiff did not show, beyond his low IQ score, that he had another mental impairment that imposed significant work-related

limitations on his functioning.  *See* AR at 19, 226; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

12.05(c).  At step two of the sequential process, the ALJ found Plaintiff's intellectual disability to

be his sole severe impairment.  *See* AR at 18.  For the reasons presented above, Plaintiff's

argument that his PTSD is an additional severe impairment that satisfies the third requirement of

§ 12.05(C) unavailing.

In addition, after examining Plaintiff on March 28, 2009, Dr. Kimball observed that

Plaintiff "concentrate[d] and focus[ed] well" during his intelligence testing, was not anxious, was

well oriented, spoke clearly and understandably, had no sign of psychiatric issues, and

demonstrated fair insight and judgment.  *See* AR at 225-29.  Dr. Kimball's opinion that Plaintiff

could perform simple work with concrete tasks and no academic skills further affirms the ALJ's

finding.  *See id.* at 229.

Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion

that Plaintiff's intellectual disability does not meet or medically equal § 12.05(C); and, thus, he is

not *per se* disabled.  *See* AR at 17.


**E.     Application of the special technique**

"[W]hen evaluating the severity of a claimant's mental impairments, the ALJ must apply

the 'special technique' requirement at the second and third steps of h[er] review in addition to the

customary sequential analysis."  *Stenoski v. Comm'r of Soc. Sec.*, No. 7:07-CV-552, 2010 U.S.

Dist. LEXIS 24030, *5 (N.D.N.Y. Mar. 16, 2010) (citation omitted); *see also* 20 C.F.R.

§ 416.920a(a) (requiring ALJs to incorporate the special technique in their written decisions

when claimants allege mental impairments).  The special technique is essentially a three-part

test.  First, the ALJ must determine whether the claimant has a medically determinable mental

impairment, specifying "the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)[.]"  20 C.F.R. § 416.920a(b)(1).

Second, the ALJ rates the degree of the claimant's functional limitations resulting from the impairment in four areas: (1) "activities of daily living," (2) "social functioning," (3) "concentration, persistence, or pace," and (4) "episodes of decompensation."[5]  20 C.F.R. § 416.920a(c)(3).  The ALJ rates the first three functional areas on a scale of "[n]one, mild, moderate, marked, and extreme"; whereas, he rates the fourth functional area on a scale of "[n]one, one or two, three, and four or more."  20 C.F.R. § 416.920a(c)(4).  "A rating at the highest point on either scale indicates a degree of limitation that is incompatible with the ability to perform gainful activity."  *LaTante v. Astrue*, No. 7:06-CV-722, 2010 U.S. Dist. LEXIS 133932, *12 (N.D.N.Y. Dec. 17, 2010) (citation omitted).

Third, if the claimant's mental impairment is severe, then the ALJ must compare the functional limitation ratings and relevant medical findings to the criteria for mental disorders enumerated in the Listings.  *See* 20 C.F.R. § 416.920a(d)(2).  The goal of this comparison is to determine whether the claimant's impairment meets or medically equals in severity any listed mental disorder.  *See id.*  If the impairment meets a listed disorder, then the claimant is *per se* disabled.  If not, then the ALJ proceeds with the five-step analysis to examine the claimant's RFC.  *See* 20 C.F.R. § 416.920a(d)(3).

In this case, the ALJ applied the requisite special technique with the necessary specificity to allow for a meaningful review in this case.  *See* AR at 16-17; *see also Whipple v. Astrue*, No.

---

[5] "'*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.'"  *Kohler v. Astrue*, 546 F.3d 260, 266 n.5 (2d Cir. 2008) (quotation omitted).

5:08-CV-1356, 2011 U.S. Dist. LEXIS 35504, *28 (N.D.N.Y. Mar. 8, 2011) (stating, "[a]n ALJ's failure to apply the special technique constitutes a ground for remand, in the absence a finding of harmless error" (citation omitted)), *adopted by* 2011 U.S. Dist. LEXIS 34384 (N.D.N.Y. Mar. 31, 2011).  First, the ALJ appropriately weighed Plaintiff's medical history and documented the evidence on which she relied, including records from Mercy BH in 2006, the results of Dr. Kimball's consultative evaluation on March 28, 2009, and Dr. Kudler's psychiatric assessment on April 20, 2009, to support the conclusion that Plaintiff's intellectual disability was a medically determinable mental impairment.  Second, although the ALJ reasoned that Plaintiff's intellectual disability caused no or mild restrictions in activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation, she concluded that Plaintiff's disability was a severe impairment because his low-level intelligence limited him to unskilled work.[6]  *See* AR at 16-17.  Third, the ALJ properly continued her analysis by comparing Plaintiff's intellectual disability to the criteria in Listing § 12.05.  *See id.* at 17-19; *see also* 20 C.F.R. § 416.920a(d)(2).  In doing so, the ALJ found that Plaintiff's intellectual disability neither met nor medically equaled the criteria in paragraphs A, B, C, or D of Listing § 12.05 and appropriately proceeded to step-four of the sequential process and evaluated his RFC.

Moreover, Plaintiff fails to persuade the Court that the ALJ's application of the special technique is contradictory to substantial evidence in the record.  *See* Dkt. No. 10 at 16.  Plaintiff objects that the ALJ failed to acknowledge his PTSD and other intellectual deficiencies in applying the special technique.  *See id.*  In raising this objection, Plaintiff narrowly focuses on the ALJ rating Plaintiff's intellectual disability to have no or mild restrictions in the four

---

[6] Since the ALJ found that Plaintiff's intellectual disability was a severe impairment despite the low ratings she assigned to his functional limitations, the Court does not outline the substantial evidence supporting the ALJ's ratings.

functional areas.  *See id.*  For instance, Plaintiff insists that his school records and Dr. Kimball's conclusions contradict the ALJ's finding that he suffered mild functional limitations.  *See id.* at 17-18.  Plaintiff's objection, however, misses the mark because, despite the ALJ's ratings, she still concluded that his intellectual disability was a severe impairment.  *See id.* at 16-18.  Beyond this misguided argument, Plaintiff offers no record evidence to support his objection.

Additionally, the ALJ properly compared Plaintiff's intellectual disability to the requirements for a mental disorder enumerated in the Listings and determined that his impairment did not meet or medically equal Listing § 12.05.  *See id.* at 17-19.  Even assuming that Plaintiff is functionally illiterate and that taking special education classes does not equate to a high school education, this evidence alone does not suggest that Plaintiff has another significant limitation beyond his low intellectual functioning to satisfy Listing § 12.05(C).  Additionally, Plaintiff argues that the ALJ should have accepted Dr. Hall's PTSD diagnosis and Dr. Kimball's conclusion that he can only perform jobs with concrete tasks and no academic skills; however, he fails to persuade the Court as to how accepting said information would render him *per se* disabled under the Act.

Accordingly, the Court denies Plaintiff's motion on this ground.


F.      **Plaintiff's subjective complaints**

"'An [ALJ] may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility[.]'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quotation omitted).  The ALJ, however, must present the reasons for his credibility determination "'with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by

substantial evidence.'" *Id.* (quotation omitted).  Reviewing courts should afford deference to an ALJ's credibility determination because she heard the testimony and observed the witnesses' demeanor.  *See Cohn v. Astrue,* No. 10-CV-214, 2012 U.S. Dist. LEXIS 43849, *15 (N.D.N.Y. Mar. 29, 2012) (noting that "[t]he ALJ's decision to discount [the p]laintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous" (citation omitted)).

In considering Plaintiff's credibility, the ALJ follows a two-step analysis of the pertinent evidence in the record.  *See* 20 C.F.R. § 416.929(b)-(c).  First, the ALJ must determine, based on the claimant's objective medical evidence, whether the claimant's impairments "could reasonably be expected to produce the pain or other symptoms alleged[.]"  20 C.F.R. § 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit his ability to work.  *See* 20 C.F.R. § 416.929(c).  When the objective evidence does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the claimant's credibility by considering the record in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve pain or other symptoms; (5) other treatment that the claimant receives or has received to relieve pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. § 416.929(c)(3).

In this matter, the ALJ found that Plaintiff's intellectual disability could reasonably be expected to cause his alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of his condition were not credible.  *See* AR at 20.  After reviewing the record in this case, it is clear that substantial evidence supports the ALJ's credibility determination and that her analysis coincides with the applicable legal standards.  *See Aponte v. Sec'y, Dep't of Health & Human Servs*., 728 F.2d 588, 591 (2d Cir. 1984) (stating that, if substantial evidence supports the ALJ's decision to discount a claimant's subjective complaints of pain, then the court must uphold that decision (citations omitted)).  Indeed, the ALJ presented the reasons for her credibility determination """with sufficient specificity to enable [this Court] to decide whether the determination is supported by substantial evidence."""  *Lewis*, 62 F. Supp. 2d at 651 (quotation omitted).

In support of her decision, the ALJ relied on the wide range of independent daily activities Plaintiff stated that he could perform, including caring for his personal hygiene, performing simple household chores, cooking Roman noodles and hot dogs, washing laundry, and cleaning dishes.  *See* AR at 16, 20-21, 56-58, 64, 224, 228; *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003) (holding that the ALJ properly discounted claimant's subjective complaints of pain where claimant was able to cook, clean, do laundry, attend class, drive, shop, and swim); *Cornell v. Astrue*, 764 F. Supp. 2d 381, 400 (N.D.N.Y. 2010) (holding that claimant's testimony that she tended to her personal hygiene, sometimes cared for her three-year-old niece, and used public transportation undermined her credibility (citations omitted)).  Additionally, Plaintiff's subjective complaints were only partially credible because he (1) failed to furnish a

letter from his most recent employer confirming that his discharge was due to his incompetence,[7] *see* AR at 33; (2) cared for his two children, which required a high degree of mental functioning, *see id.* at 64; (3) reported that he enjoyed working on automobiles, *see id.* at 62-63, 226; and (4) testified that he could concentrate when his hands were always moving, *see id.* at 63.  *See* AR at 20-21, 33.  Further, Plaintiff neither took medications as an adult nor underwent other measures to alleviate his alleged symptoms.  In fact, Plaintiff testified that he had not seen any doctors post high school.  *See id.* at 32-33.

Additionally, Plaintiff's ability to obtain a valid driver's license, "which entail[ed] passing a test requiring comprehending and answer questions related to driving," also shed questionable light on his intellectual disability claim.  *Winslow v. Astrue*, No. 3:11-cv-00052, 2012 U.S. Dist. LEXIS 95101, *23-*24 (N.D.N.Y. July 10, 2012) (affirming the ALJ's RFC determination, in part, because the claimant had a driver's license).  Plaintiff testified at the hearing that he could only read small words such as "an," "the," "is," "at," "they," and "went" but thereafter testified that he had "no problem" reading road signs like "Route 11."  *See* AR at 60; *see also Flagg*, 2012 U.S. Dist. LEXIS 126708, at *23-*24 (finding that the plaintiff's borderline intellectual functioning was not severe, in part, because the claimant had a driver's license and drove) (citations omitted); *Stewart v. Apfel*, 996 F. Supp. 186, 193 (N.D.N.Y. 1998) (dismissing the claimant's disability claim for borderline intellectual functioning partly because he possessed a driver's license and indicated that he could drive).

Moreover, other evidence in the record challenges Plaintiff's credibility and supports the ALJ's determination.  Such evidence includes the following: (1) Plaintiff's testimony that he

---

[7]   At the originally scheduled hearing on May 26, 2010, Plaintiff asked the ALJ if he could submit a statement from McDonalds, explaining that he was discharged because he could not read food orders and could not prepare the orders at an adequate pace.  *See* AR at 33.

could concentrate when fixing automobiles and building things with wood because his "hands

[were] always moving" and he was not sitting, *see* AR at 20, 62-63; and (2) Plaintiff's failure to

produce documentation from his most recent employer to substantiate his allegation that he was

incapable of working a job without being discharged for incompetence, *see id.*  In addition, the

ALJ unquestionably considered Plaintiff's hearing testimony and the objective evidence

regarding his intellectual disability.  In fact, the ALJ acknowledged in her decision that Plaintiff

"was classified by his school district as mentally retarded, and he received special education

services while in high school[,]" and that "[r]esults of testing ha[d] found [Plaintiff] to be

predominately functioning in the mentally retarded to borderline range of intelligence."  *See id.*

at 20.

Accordingly, because the ALJ completed a thorough credibility analysis and followed the

relevant legal standards, the Court denies Plaintiff's motion on this ground.


**G.     RFC determination**

A claimant's RFC is the most he is capable of performing notwithstanding his limitations

at issue.  *See* 20 C.F.R. § 416.945(a)(1).

> "Ordinarily, RFC is the [claimant's] maximum remaining ability to
> do sustained work activities in an ordinary work setting on a
> regular and continuing basis, and the RFC assessment must include
> a discussion of the individual's abilities on that basis.  A 'regular
> and continuing basis' means 8 hours a day, for 5 days a week, or an
> equivalent work schedule."

*Petersen v. Astrue*, No. 11-CV-116, 2012 U.S. Dist. LEXIS 137167, *10-*11 (N.D.N.Y. Aug.

10, 2012) (quoting [*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)]).

"In making a [RFC] determination, the ALJ must consider a claimant's physical abilities,

mental abilities, symptomology, including pain and other limitations which could interfere with

work activities on a regular and continuing basis." *Tilbe v. Astrue*, No. 5:10-CV-910, 2012 U.S. Dist. LEXIS 99646, *29 (N.D.N.Y. July 17, 2012) (citing 20 C.F.R. § 404.1545(a)). An ALJ determines a claimant's RFC based on all relevant evidence in the record. *See Magee v. Astrue*, No. 5:05-CV-413, 2008 U.S. Dist. LEXIS 73712, *16-*17 (N.D.N.Y. Sept. 9, 2008) (citation omitted); *see also* 20 C.F.R. § 416.945(a). For a reviewing court to uphold the ALJ's RFC determination, substantial evidence in the record must support that determination. *See Magee*, 2008 U.S. Dist. LEXIS 73712, at *17 (citation omitted).

If "a mental impairment is deemed severe, but does not meet or equal a listed mental disorder, the [ALJ] considers whether a claimant is limited in the ability to carry out certain mental activities[.]" *Whipple*, 2011 U.S. Dist. LEXIS 35504, at *31 (citing 20 C.F.R. §§ 416.920a(d)(3), 416.945(c)) (other citations omitted). This includes "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work." *Id.* (citations omitted).

Here, after applying the special technique, the ALJ properly found that Plaintiff had the RFC to perform the full range of work at all exertional levels. *See* AR at 19. The ALJ also found that, during the course of an eight-hour workday, Plaintiff could (1) understand, carry out, and remember simple instructions; (2) respond appropriately to supervision, co-workers, and usual work situations; and (3) deal with changes in a routine work setting. *See id.* Also, Dr. Kimball's and Dr. Kudler's opinions, which the ALJ afforded "some weight," substantiate the ALJ's RFC determination that Plaintiff retained the abilities to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal appropriately in a work setting. *See id.* at 21, 223-29, 244-47.

Specifically, on March 28, 2009, Dr. Kimball evaluated Plaintiff and administered an intelligence test. *See id.* at 21, 228. Dr. Kimball noted that Plaintiff's test results showed variability, as he had good verbal comprehension skills but poor perceptual reasoning skills. *See id.* at 228. Plaintiff's intelligence level also teetered between borderline intelligence and mental retardation; however, Dr. Kimball opined that Plaintiff's verbal comprehension skills suggested that he had borderline intelligence with significant learning problems. *See id.* at 229. Thus, Dr. Kimball opined that Plaintiff's intellectual disability limited him to jobs that involved concrete tasks and no academic skills. *See id.*

Similarly, on April 20, 2009, Dr. Kudler completed a mental RFC assessment, opining that Plaintiff could perform simple work despite his psychiatric impairments. *See id.* at 244-47. Specifically, Dr. Kudler opined that Plaintiff could do the following: (1) remember work-like procedures and locations; (2) understand, remember, and carry out short and simple instructions; (3) maintain attention and concentration for extended periods of time; (4) perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) work in coordination with or proximity to others without being distracted; (6) accept instructions and respond appropriately to supervisors' criticism; (7) work well with coworkers/peers without distracting them or exhibiting behavioral extremes; and (8) travel to unfamiliar places or use public transportation. *See id.* at 244-45. At most, Dr. Kudler found that Plaintiff was "moderately limited" in his ability to understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. *See id.* Although Dr. Kudler was a non-examining State psychological consultant, the ALJ properly relied on his opinion

because a non-examining medical consultant's opinion may constitute substantial evidence where, as here, evidence in the record supports it.  *See Provost-Harvey v. Comm'r of Soc. Sec.*, No. 1:06-CV-1128, 2008 U.S. Dist. LEXIS 19551, *15 (N.D.N.Y. Mar. 13, 2008) (stating that "[t]he evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence" (citation omitted)).

Accordingly, the Court finds that substantial evidence supports the ALJ's RFC determination.

### H.      Step five: consulting a vocational expert

At step-five of the sequential analysis, the ALJ determines whether other work exists in significant numbers in the national economy befitting the claimant's age, education, work experience, and RFC.  *See* 20 C.F.R. § 416.920(g); *see also Pidkaminy v. Astrue*, No. 5:11-CV-865, 2013 U.S. Dist. LEXIS 8313, *35-*36 (N.D.N.Y. Jan. 22, 2013) (citations omitted).  In doing so, the ALJ generally resorts "to the applicable the medical vocational guidelines, commonly referred to as the 'Grids.'"[8]  *Pidkaminy*, 2013 U.S. Dist. LEXIS 8313, at *36 (citation and footnote omitted).  However, "'[i]f a claimant has nonexertional limitations that "significantly limit the range of work permitted by his exertional limitations," the ALJ is required to consult with a vocational expert.'"[9]  *Brown*, 2013 U.S. Dist. LEXIS 1515, at *31

---

[8] "The Grid classifies work into five categories based on the exertional requirements of the different jobs."  *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996); *see also* 20 C.F.R. § 416.967(a).  "Upon consideration of the claimant's [RFC], age, education, and prior work experience, the Grid yields a decision of 'disabled' or 'not disabled.'"  *Brown v. Astrue*, No. 11-CV-519, 2012 U.S. Dist. LEXIS 104905, *27 (N.D.N.Y. July 26, 2012) (quotation omitted).

[9] Exertional limitations are "restrictions imposed by [a claimant's] impairment(s) and related symptoms" that affect his "ability to meet the strength of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §§ 404.1569a(b), 416.969a(b).  In contrast, non-exertional limitations are "restrictions imposed by [a claimant's] impairment(s) and related

(quoting *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)). Nevertheless, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986). Rather, a vocational expert's testimony is required only "when a claimant's nonexertional impairments significantly diminish his ability to work — over and above any incapacity caused solely from exertional limitations — so that he is unable to perform the full range of employment indicated by the [Grids.]" *Id.*; *see also* Social Security (SSR) 85-15, 1985 SSR LEXIS 20 (1985) (promulgating guidelines and examples to illustrate when a nonexertional limitation will significantly limit a claimant's range of work).[10]  Courts assess the need for a vocational expert "on a case-by-case basis." *Bapp*, 802 F.2d at 605.

    In this case, the ALJ did not err in solely relying on Rule 204.00 of the Grids to determine that jobs existed in significant numbers in the national economy that Plaintiff could perform.  *See* AR at 22.  Although the ALJ acknowledged that Plaintiff had nonexertional limitations that compromised his ability to perform the full range of work at all exertional levels, she properly reasoned that those limitations had little or no effect on his occupational base of unskilled work.  *See id.*  Since Plaintiff's nonexertional limitations did not erode his occupational base, the ALJ did not consult a vocational expert.  *See id.*

_____

symptoms" that affect his "ability to meet the requirements of jobs other than the strength demands[.]"  20 C.F.R. §§ 404.1569a(c), 416.969a(c).  They include, among other things, pain, depression, anxiety, and inability to concentrate.  *See id.*

    [10] SSR 85-15, 1985 SSR LEXIS 20, states, in pertinent part, that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, 1985 SSR LEXIS 20, *11 (1985).  Thus, "[a] substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."  *Id.*

Further, Plaintiff's RFC is consistent with the basic mental demands of competitive, remunerative and unskilled work.  Indeed, Dr. Kudler opined that Plaintiff had the mental RFC to (1) remember work-like procedures and locations; (2) understand, remember, and carry out short and simple instructions; (3) maintain attention and concentration for extended periods of time; (4) perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) work in coordination with or proximity to others without being distracted; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers/peers without distracting them or exhibiting behavioral extremes; and (8) travel to unfamiliar places or use public transportation.  *See id.* at 244-45.  Since Plaintiff's nonexertional limitations did not result in an additional loss of work capability, the ALJ appropriately resorted to the Grids.  *See Zabala*, 595 F.3d at 411 (finding that the claimant's "mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision").

Accordingly, the Court finds that Plaintiff's intellectual disability is not a significant nonexertional impairment that necessitated additional testimony from a vocational expert and, therefore, affirms the ALJ's step-five determination.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion is **DENIED**; and the Court further

**ORDERS** that the Court Clerk shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED**.

Dated: July 2, 2013
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge